**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HELMUT ZARWASCH-WEISS, | ) | CASE NO.    1:10-cv-01327 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SKF ECONOMOS USA, INC. *et al*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| | ) | |
| SKF USA INC., | ) | CASE NO.    1:10-cv-01548 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | NANCY A. VECCHIARELLI |
| HELMUT ZARWASCH-WEISS *et al*, | ) | |
| | ) | Doc. No. 165 |
| Defendants. | ) | |

         This case is before the magistrate judge on consent.  Before the court is the motion

of plaintiff in Case No. 1:10-cv-01548, SKF USA, Inc. ("SKF USA"), for attorney's fees and

costs.  Doc. Nos. 165[1] ("motion").  Defendants, Helmut Zarwasch-Weiss ("Zarwasch") and

Heza Seal, LLC ("Heza") do not oppose plaintiff's motion or challenge the expenditures

listed in the bill of costs.  For the reasons described below, the court **GRANTS** plaintiff's

motion for fees and costs with modifications, awarding attorney's fees and costs in the

amount of $157,374.48 pursuant to the Ohio Uniform Trade Secrets Act ("OUTSA") and

---

         [1]  All docket numbers refer to the docket in Case No. 1:10-cv-01548.

$40,006.95 pursuant to 28 U.S.C. § 1920 ("§ 1920").

I

Zarwasch was General Manager of Economos Philippines Co., Ltd. from 1999-2003, Regional Sales Manager for Economos for South East Asia for Economos Austria from 1999 to 2003, and General Manager of Economos Thailand Co. Ltd. from 2001-03.  In 2003, he came to the United States and became President of Economos USA ("SKF Economos").[2]  SKF Economos manufactured small lots of custom seals for pneumatic and hydraulic devices.

On January 1, 2006, Zarwasch and SKF Economos entered into a Managing Director Agreement ("the Agreement") whereby Zarwasch was obliged to protect the interests of SKF Economos.  Plaintiff's Spoliation Hearing and Trial Exhibits (" Pl. Exhs."), # 1, p. 2.  The Agreement included the following provisions:

> 5)  <u>Secrecy</u>
>
> The Managing Director is under the obligation to protect the interests of the company at all times.  He may not disclose to any third party (also relatives and employees of the Company) any confidential information regarding the Company's business, except if there should exist a compelling duty to disclose information by law.
>
> The obligation of secrecy also includes the provisions of this agreement.
>
> This secrecy obligation extends beyond the termination of this agreement.
>
> 6)  <u>Reponsibilities and Duties</u>
>
> *       *       *       *       *
>
> The Managing Director has to file and protect all business records and documents, including EDP files and documents.  Copies are only to be made for Company use.
>
> In case of termination of the agreement, the Managing Director shall hand

---

[2]  The company was then known as Eco Seal Tech.  The company has changed its name and ownership several times in the past seven years.

2

over to the Company all documents, books, records, correspondence and other papers related to the business of the company.

Agreement at 2.  Zarwasch's prior and later employment contracts with the Economos and SKF entities contained similar provisions.

A.    *The merger of SKF Economos and SKF USA*

In August 2006, SKF Economos became wholly owned by SKF Austria, which was, in turn, wholly owned by AB SKF.  SKF Economos reported to SKF Economos Austria, which in turn reported to SKF Austria.  The two Austrian companies provided technical support and raw materials to SKF Economos.  In addition, SKF Economos Austria handled financial information for all Economos companies.  SKF USA, which was owned by AB SKF and was thus affiliated with SKF Economos, handled human resources for all SKF entities in the United States, including those of SKF Economos during 2009.

Beginning in May 2009, SKF Economos and SKF USA began working toward merging the two companies.  That month, representatives of both companies met to discuss how to integrate the companies and use the companies' combined resources to expand operations.  Attending this meeting were Zarwasch, then Managing Director of SKF Economos; Gerhard Schneeweis ("Schneeweis"), the CEO of Economos Austria; Thomas Schwarz of SKF Economos Austria; and various representatives of SKF USA, including Bart Bartholomew ("Bartholomew"); Don Poland ("Poland"), Christopher Wierling, and William Moore ("Moore").  Bartholomew worked for SKF USA and was head of the integration team appointed to work out the details of the merger.  Those present at this meeting orally agreed that the information to be shared as part of the integration effort

3

would be kept confidential.[3]

On January 1, 2010, SKF USA acquired all the stock of SKF Economos, and the two companies merged.  SKF Economos became a division of SKF USA.  By virtue of the merger, SKF USA acquired all property of SKF Economos, including all confidential information.

*B.  Zarwasch's administrative leave and termination*

In August 2009, as a result of complaints from employees, Zarwasch was put on administrative leave.  With one exception, he did not return to the SKF Economos office.

When Zarwasch was employed at SKF Economos, the company provided him a laptop computer for personal use ("the SKF laptop").  Through the SKF laptop, Zarwasch could log on remotely to the SKF Economos network, allowing Zarwasch to work from home or while traveling.  According to Zarwasch, he kept the computer turned on at all times.  Zarwasch also testified that members of his family had access to his SKF laptop and sometimes attached electronic devices to it.  Zarwasch also claimed that his family also used the computer to download songs and movies from the internet.  SKF Economos permtted Zarwasch to keep the SKF laptop while he was on leave.

During Zarwasch's leave, the company and Zarwasch entered into negotiations to determine if Zarwasch would fill another position with SKF Economos.  Zarwasch turned down offers of jobs in other countries on October 19, 2009.  When SKF Economos concluded that Zarwasch would not be taking another position with the company, it

---

[3]  Zarwasch denied that there was such an oral agreement.  The court found this denial not to be credible.  There was testimony at trial in support of there having been an oral agreement, and Zarwasch's veracity has, on multiple issues, been shown to be dubious.

4

delegated to SKF USA the job of working out a separation agreement with Zarwasch.  SKF USA designated two of its human resources managers, Angelo Galli and Jeffrey Nelson, to handle this task.  SKF Economos and SKF USA were concerned that Zarwasch was not subject to a non-compete agreement and tried without success during these negotiations to convince him to sign such an agreement.

On October 29 or 30, 2009, Galli notified Zarwasch that he would be terminated.  As part of negotiating a separation agreement with Zarwasch, Galli sent various drafts of such an agreement to Zarwasch, and Zarwasch, in turn, presented counter-proposals.  Finally, Galli notified Zarwasch that he had until November 20, 2009 to sign one of the drafts.  Zarwasch did not do so.  On November 20, 2009, Galli left Zarwasch a voicemail message that Zarwasch's deadline had expired and that SKF Economos Austria had rejected his counterproposals.  On November 24, 2009, the Chairman of the Board of SKF Economos, Gerhard Schneeweis ("Schneeweis") sent Zarwasch an e-mail confirming that Zarwasch had been notified of his termination on October 30, 2009 and that Galli and Nelson were authorized to act on behalf of SKF Economos with regard to Zarwasch's separation.

When the November 20, 2009 deadline passed without Zarwasch's signing a separation agreement, Galli took steps to effect Zarwasch's termination.  Among other things, he directed Ciofani to collect all of SKF Economos's property in Zarwash's possession.  Galli had allowed Zarwasch to keep his SKF laptop during these negotiations.  When negotiations failed to achieve an amicable separation, Galli took unilateral steps to effect that termination.

On November 23, 2009, at Galli's direction, Ciofani e-mailed Zarwasch.  Attached

5

to the e-mail was a letter from Galli requesting that Zarwasch return all company property, including the SKF laptop.[4]  Galli also e-mailed Zarwasch directly on November 23, 2009 sking that Zarwasch return all SKF Economos property, including all SKF Economos records.  Zarwasch responded that Galli and Ciofani had no authority to make demands of him and that he would only return the property at the direction of the board of directors. On November 26, 2009, Schneeweis telephoned Zarwasch and told him that the board had directed SKF USA and Galli to handle Zarwasch's termination.  On December 3, 2009, Galli succeeded in making arrangements with Zarwasch for the return of the company's property.

Dwyer and Ciofani met with Zarwasch on December 7, 2009, and Zarwasch gave them his SKF laptop.  Dwyer presented a document to Zarwasch which stated that Zarwasch had returned all SKF Economos property in his possession and asked Zarwasch to sign the document.  Zarwasch refused.  Zarwasch did not tell Dwyer or Ciofani that his cell phone contained contact data for some of SKF Economos's customers.

Dwyer took possession of Zarwasch's SKF laptop.  Dwyer locked the computer in his desk without turning it on.  The next day,  he gave it to Bartholomew, who had taken over managing SKF Economos.  Bartholomew marked the laptop "Quarantined, do not open" and locked it in a filing cabinet.  He did not turn it on while it was in his possession. He later gave it to SKF USA's audit department for imaging.

*C. Zarwasch's misappropriation of SKF Economos's information*

From August 1, 2009 through December 7, 2009, Zarwasch accessed about

---

[4]  The letter exempted a company car.  Zarwasch was allowed to keep the car until the end of January 2010.

489,000 files on his SKF laptop computer.  Zarwasch accessed a large number of files in a relatively short amount of time, accessed files very quickly, accessed many files within the same second, and accessed them in rapid succession.  According to the unrebutted testimony of Anthony Balzanto ("Balzanto"), SKF USA's computer forensics expert, this sort of activity generally indicates the copying or transfer of large numbers of files.

Zarwasch's copying of large numbers of files peaked at times that roughly correlated with significant events occurring between his taking a leave of absence and his return of the SKF laptop.  Zarwasch turned down SKF Economos's offers of jobs in other countries on October 19, 2009.  On October 21, 2009, he accessed about 5,000 files.  On October 29 or 30, 2009, Galli told Zarwasch that he would be terminated and sent him a separation agreement.  Zarwasch accessed 68,556 files on October 30, 2009, about 9,000 files on November 6, 2009, and 43,466 files on November 16, 2009.  Zarwasch's deadline to sign a separation agreement was November 20, 2009, and Ciofani and Galli asked him to return SKF Economos's property on November 23, 2009.  On November 24, 2009, Zarwasch accessed 39,911 files.  On December 3, 2009, Zarwasch made arrangements to return the SKF laptop on December 7, 2009.  Zarwasch accessed 19,643 files on December 6, 2009 and 32,770 files on December 7, 2009.

The files that Zarwasch accessed during this period included over 5,000 drawings, 24 confidential reports on SKF Economos customers from ABAS, and ABAS files for all companies that he later identified as customers of Heza.

Zarwasch denied copying large numbers of files on his SKF laptop.  He failed to provide, however, a credible reason for the pattern of file access described above.  He mentioned that his children may have used the computer to download music and movies

7

from the internet.  Zarwasch also noted that he needed to access SKF Economos's files to prepare a report for Thomas Schwarz ("Schwarz"), an Austrian manager.  Zarwasch sent that report to Schwarz, however, on September 4, 2009, which was prior to most of Zarwasch's large-scale copying or transfer of files.  Neither explanation justifies the accessing of extraordinarily large numbers of files in very short amounts of time.  This testimony does nothing to explain the pattern of accessing SKF Economos files detected by Balzanto.  Moreover, Zarwasch's testimony on this point was vague, inconsistent, and unbelievable.

Zarwasch transferred data from his SKF laptop to USB devices and by e-mailing the data to himself.  He attached at least 36 USB devices to his SKF laptop during his leave of absence.[5]  One USB device was last connected to the SKF laptop on October 24, 2009 and another on December 7, 2009, dates on which large numbers of files were accessed.[6]  Three USB devices were connected both to the SKF laptop and to computers at Heza.  A device last connected to the SKF laptop on October 24, 2009 was later connected to two Heza computers, one on July 1, 2010 and one on July 2, 2010.  The other two USB devices

---

[5]  There are a variety of methods by which files may be copied or transferred from the hard drive of a computer to another method of information storage, including transfer to a CD, transfer to a DVD, cloud storage, and internet transfer.  At least one method of transfer, however, leaves metadata in the host computer indicating that such a transfer may have occurred.  When a USB data storage device is attached to a computer, the computer's registry records the serial number of the USB device and the dates on which the device was first and last attached to the computer.  The host computer does not record any details regarding which data or how much data, if any, was transferred to the USB device.  To learn that information, the USB device itself must be examined.  Zarwasch failed to produce in discovery any of the 36 USB devices attached to the SKF laptop during Zarwasch's leave of absence and failed to provide any credible reason for their non-production.

[6]  Zarwasch eventually produced a USB drive last attached on October 24, 2009.  He did not produce the USB device last attached on December 7, 2009.

8

were connected to Heza's computers in June and July.[7]

Zarwasch purchased a Toshiba laptop computer ("the Toshiba laptop") on or soon after November 24, 2009.[8]  On December 9, 2010, he used it to go online, register it, and download software.  The keyboard was configured consistent with use in the United States. Zarwasch testified at the spoliation hearing that he never turned the Toshiba laptop on after this time and that he brought it to Europe and gave it to his brother in Austria.[9]  Zarwasch's testimony about the use of the Toshiba laptop was not credible.

In January or February 2010, an old Siemen's computer that Zarwasch had used both for Heza business and for personal business broke.  Zarwasch transferred the information on the Siemen's computer to another hard drive, then he destroyed and discarded the Sieman's computer. According to Zarwasch, the transferred information included SKF Economos's information in the form of e-mails he sent to himself.

On April 30, 2010, Haris Huskic ("Huskic") agreed to join Heza.  At that time, Huskic was working as an inside salesperson at SKF Economos.[10]  On May 10, 2010, Huskic sent from his SKF Economos e-mail account to his personal email account an e-mail with SKF Economos' confidential monthly sales statistic report as an attachment.   This report

---

[7]  None of the three USB devices attached both to the SKF laptop and to the Heza computers was produced during discovery.

[8]  Zarwasch testified that he purchased the Toshiba computer before December 9, 2009 and that he knew he had to return the SKF laptop when he purchased the Toshiba. Ciofani e-mailed Zarwasch to return the SKF laptop on November 24, 2009.

[9]  On December 8, 2009, Zarwasch wrote to Hans Peter Schoeffauer at Seal Mart in Austria that he had a new "box" with Skype.

[10]  At the trial, Huskic denied that he agreed this early to work at Heza.  The court found a calendar entry by Zarwasch establishing the April 30, 2010 date to be more credible than Huskic's testimony.

9

contained a summary of SKF Economos revenues and other information about customer orders for the month, as well as historical customer and revenue information.  Then, in June 2010, Huskic told SKF Economos that he was resigning.

When a forensic expert examined Heza's computers, he found, among other documents, an SKF Economos purchase order that included the company's pricing; complete drawings of seals, including the critical dimensions for cutting, that SKF Economos had received from Mitsubishi Power Systems; and an invoice for Master Machine Works from SKF Economos that contained a seal profile, dimensions, and pricing information.  All of these documents are normally kept confidential.  During discovery, defendants produced the computer passwords that SKF Economos salespersons had used prior to Zarwasch's departure from the company.  Zarwasch had assured Dwyer that he would delete this information when he left SKF Economos.

*D. Zarwasch's use of SKF Economos's confidential information*

Zarwasch planned Heza as his own company to compete with SKF Economos.  Heza was to produce custom seals in small amounts for pneumatic and hydraulic equipment.  Heza was, therefore, to be a direct competitor with SKF Economos.

By December 8, 2009, Zarwasch was negotiating raw material prices with suppliers in Austria for his new business.  At this time, he had in his possession precise information about the prices and discounts SKF Economos received for its raw materials from its own suppliers.

On March 15, 2010, Zarwasch sent an e-mail to Holzer ("Holzer") at GZGI@sbcglobal.net.  Attached to the e-mail was a version of Heza's business plan and projections for Heza.  Included as part of this business plan were the following two

10

paragraphs:

> There is a known customer base of approximately 1500 customers on file. Approximately 98% of their products are known.  The re-order rate is higher than 50%.  The turnover in 2008 for this customer base was around 4.4Mio$ and in 2009 close to 4.0 Mio$.
>
> The target is to turn 30% of these customers over to Heza seal LLC.  To achieve this it will be necessary to show key advantages to this existing customer base.  This will affect the Heza Seal operation mainly on the inside.  Quick response to inquiries, stable quality, superior manufacturing capabilities and some case it [sic] will have to be through pricing.

Business Plan, Pl. Exh. 195A, p. 12.[11]  Below these paragraphs was a chart with columns headed "Sales Records," "All Sales," "Pieces," "Price/seal," "COS," "Net Selling Price," "Material," and "Material Times."  The rows were titled "AV 2003" through "AV 2008."  Zarwasch used this business plan in attempts to raise capital for Heza and in e-mails announcing the formation of Heza.

The references to $4.4 million in 2008 and $4.0 million in 2009 match the revenues for SKF Economos in those years.  The 1,500 customers in the "known customer base" approximates the 1,262 customers in the SKF Economos customer base.  The statistics used in the chart printed on this page are nearly identical to those in the SKF Economos sales statistics turnover report that Zarwasch attached to an e-mail sent to the SKF Economos sales force on August 1, 2009.[12]  Pl. Exh. 49A & B, p. 32.  The information in the Heza business plan contains fewer categories of information than the SKF Economos sales data in the August 1, 2009 attachment, and it orders the data used differently.  Otherwise, the total sales data for each of the years 2003 through 2007 and the data in six

---

[11]  Heza used at least two versions of this business plan, both containing the quoted paragraphs and the table described below. *See also* Business Plan, Pl. Exh. 116A, p. 11.

[12]  Zarwasch denied that he had appropriated the statistics from SKF Economos but was unable to identify the source of those statistics.

11

other categories of information for each of those years in the Heza chart match exactly the data in the SKF Economos sales report attachment.  The only exception was 2008.  The numbers contained in the Heza chart and the attachment for 2008 were close, but not identical.[13]  Moreover, not only was the information in the Heza chart identical to SKF Economos's information, but the Heza chart used the same five-color scheme to highlight its annual information in the same way as was used in the August 1, 2009 attachment.

On March 16, 2010, Zarwasch e-mailed Wolfgang Prandl ("Prandl") in German.  Prandl was employed by PU1 Tech, which Zarwasch was considering as a possible supplier for Heza.  Zarwasch was attempting to get PU1 Tech to lower the price for goods and materials that PU1 Tech might supply to Heza.  Attached to this e-mail was a price list for SKF Economos rubber products, including discount pricing from SKF Economos Austria.  Zarwasch used this list as part of his bargaining with PU1 Tech.  Zarwasch acquired this list within the scope of his duties at SKF Economos and imported and saved the list on his Toshiba laptop.

On June 1, 2010, Zarwasch sent an e-mail to nearly three dozen recipients announcing the appearance of Heza, a company producing high precision seals, in the next thirty days.  Attached to the e-mail was a version of Heza's business plan.  Zarwasch originated some or all of these messages and 10 to 15 similar messages sent in the next month from his Toshiba laptop.  All the persons to whom this e-mail and attachment were sent were customers of SKF Economos's or partners of SKF Economos who carry SKF

---

[13] Dwyer testified that the discrepancy in the numbers in 2008 was caused by a mid-year change in the program used to compute the figures.  The two computations were slightly different.  The numbers in the attachment represent the computation made jointly by the two programs, whereas those in the HEZA chart represent a pure computation by the new program.

products as a distributor.  Zarwasch eventually sent similar e-mails with the Heza business plan attached to at least 239 addresses.[14]  Of these, 238 addresses corresponded to addresses of customers or vendors in the SKF Economos, including corresponding in peculiarities of formatting, such as capitalization.[15]

On June 14, 2010, Zarwasch e-mailed Holzer.  Attached to the e-mail was a large document containing the names, addresses, telephone numbers, e-mail addresses, contact persons, and other descriptive information for 1,262 companies.  The document was a nearly exact copy of information that SKF Economos regarded as its confidential customer database.  It included all of the customers in the SKF Economos customer database and all of the information regarding those customers in that database.  *Compare* Pl. Exhs. 196 (SKF Economos's customer list, taken from ABAS) *with* Pl. Exh. 193A (the attachment to the e-mail to Holzer).

Zarwasch installed computers at Heza in June 2010.  In deciding which software program Heza should purchase to help with pricing, Zarwasch used data from the SKF Economos database to test whether that data could be used with new software.

Heza began operations on June 22, 2010.  Zarwasch was the president and owner of Heza.  During June 2010, Heza received orders from and invoiced at least six customers.  All of those customers appeared on the SKF Economos database. Zarwasch was able to start operations at Heza so quickly because he solicited SKF Economos's

---

[14]  Zarwasch may have sent additional e-mails, but this cannot be determined due to his spoliation of evidence.  *See infra*.

[15]  Zarwasch denied that he had obtained this list from the SKF customer data base. He claimed that he put the list together himself from generally-available sources.  The court found that Zarwasch's testimony on this point was not credible.

13

customers and used SKF Economos's confidential information about those customers.

*E. Zarwasch's spoliation of evidence*

On May 17, 2010, Zarwasch filed an action in the Cuyahoga County, Ohio Court of Common Pleas against SKF Economos and other defendants.  This action is now identified as Case No. 1:10-cv-01327.  Zarwasch alleged a breach of an employment contract, unjust enrichment, promissory estoppel, and tortious interference with a business relationship. Defendants removed the case to federal court on June 15, 2010.  In an amended complaint, Zarwasch dropped his cause of action for unjust enrichment and added a cause of action for tortious interference with a contractual relationship.

On June 11, 2010, an attorney representing SKF Economos and other defendants in the action initiated by Zarwasch, sent Zarwasch's attorney by fax the following letter, here in relevant part:

> While we are waiting for the final number, we understand that there were a [sic] many as five thumb drives (and possibly more) and one hard drive connected to Mr. Zarwasch's SKF computer, in addition to other devices.  **Please take all steps, as required by law, to preserve these devices, as well as all other electronic and other evidence** related to Mr. Zarwasch's claims and the counterclaims.
>
> If you have any questions about this, please contact me immediately.

Motion for Spoliation Sanction, Doc. No. 47, Exh. C (emphasis added).[16]  Fax information accompanying the message indicates that the transmission of the message was successful.

---

[16]  Zarwasch and Heza argued during the spoliation hearing that this notice, given in the case brought by Zarwasch, did not require defendants to preserve electronic devices and other evidence related to the claims in the companion case.  The court was not convinced by the argument.  *Inter alia*, this argument was inconsistent with defendants' contention that the claims in the companion case are compulsory counterclaims in the case brought by Zarwasch.

SKF USA filed the complaint in Case No. 1:10-cv-01548 on July 13, 2010 against Zarwasch and Heza.  SKF USA's complaint sought damages against both defendants for violations of the OUTSA, conversion, and tortious interference with business relationships and sought also replevin.  The complaint also sought damages against Zarwasch for breach of contract and breach of fiduciary duty.  Finally, the complaint sought preliminary and permanent injunctions against both defendants.  The complaint alleged that Zarwasch set up his own company, Heza, to compete with SKF USA and used confidential information obtained from SKF Economos in Heza's operations.

On July 23, 2010, after a conference with the parties, the court issued, in relevant part, the following order:

> Defendants shall give a forensic expert appointed by plaintiff access to all external drives (including but not limited to thumb drives, USB drives, and hard drives) and computers owned or rented by defendants, Helmut Zarwasch-Weiss and Heza Seal, LLC on or before noon on Wednesday, July 28, 2010.  Plaintiff's expert shall make forensic images of these drives on site.  If it is not possible to make on site forensic images of the drives of any laptop computers owned or rented by the defendants, defendants shall permit the forensic expert to remove the laptop computers to a place where such forensic imaging may be performed.  On or before Monday, August 2, 2010 at noon, the forensic expert shall return to defendants any laptop computers taken from them.

Notice and Order, July 23, 2010, Doc. No. 9, p. 1.

Pursuant to the court's order of July 23, 2010, defendants turned over to SKF USA for forensic imaging a Dell desktop computer, four Nobilis desktop computers, a Nobilis hard drive, two Dell laptop computers, and two DMH thumb drives.  In September 2010, Zarwasch also turned over for imaging a Seagate drive purchased in June 2010 and not previously produced to SKF USA.  According to Zarwasch, the Seagate drive was damaged in early June 2010, and he turned it over to Ron Davis for repair.  On July 27, 2010, Zarwasch e-mailed Davis, telling him "[P]lease keep the damaged hard drive.  I will be

15

needing it."[17]  Zarwasch testified at the spoliation hearing that he turned over for forensic imaging all computers used to run Heza's business and all USB devices that he knew to be in his possession from June 1, 2010 to the present.  He also testified that he produced all SKF-related documents that he knew to be in his possession from June 1, 2010 to the present and that he never intentionally destroyed or hid SKF Economos documents for the purpose of having to produce them in the instant case.  He further testified that other than the computers turned over for imaging and computers in hotels at which he stayed, he did not use any computers from the time the Siemen's computer broke through July 23, 2010. He also testified that he never loaded any of SKF Economos's information onto the Toshiba laptop.

SKF USA's computer forensic expert, Balzanto,[18] examined the SKF laptop and forensic images of the devices produced by defendants.  His examination revealed many of the facts regarding Zarwasch's accessing of files on the SKF laptop, the use of USB devices, the use of a Toshiba laptop,[19] and the electronic sources of documents described above.  Balzanto's analysis of the Heza computer system also indicated that only about 30-40 documents were stored in the user storage area of each computer.  According to Balzanto, most business computers hold more documents in the user storage area. Balzanto searched the forensic images of the Heza computers, including the Seagate drive,

---

[17] Balzanto had not issued an expert report regarding the Seagate drive at the time of the spoliation hearing.

[18] As defendants did not offer a counter-expert, Balzanto's testimony at the spoliation hearing was unrebutted.

[19] The Heza computers shared e-mails sent from a computer identified as "ToshibaZW."  These e-mails attached confidential SKF Economos documents.

16

for documents attached to e-mails sent from the Heza computers.  He did not find copies of any of those documents other than as attachments to e-mails.  That is, they did not exist as stand-alone copies on any of the Heza computers' hard drives, even in the recycle bin.[20] Balzanto testified that a document cannot be saved as an e-mail attachment.  It must be saved as a stand-alone document within a particular program that enables you to save that sort of document.  Thus, stand-alone copies of documents attached to e-mails were inexplicably missing.

Those documents on the Heza computers that existed only as attachments to e-mails included several versions of the Heza business plan sent as e-mails,[21] a copy of the SKF Economos data base attached to the e-mail of June 14, 2010, and a copy of SKF Economos's pricing for raw materials attached to the e-mail of March 16, 2010.  A link file (that is, a shortcut file) on the Heza computers also indicated that a file named "HEZA Seal LLC Business Plan" existed at c:\documents and settings\HEZA\my documents\ on July 28, 2010 at 4:47:52 p.m.  That file did not exist on any of the Heza computers when the forensic images of them were created on July 29-30, 2010.  The metadata for the SKF Economos price list as attached to the March 16, 2010 e-mail indicated that this document had been created on March 9, 2010 and was last saved on March 16, 2010 by Helmut Zarwasch on a computer identified by the Microsoft Office program as "Toshiba."[22]

---

[20]  The recycle bin is where documents are assigned when they have been deleted in the usual way, such as by pressing "delete."

[21]  A version of the Heza business plan other than the versions attached to e-mails was found on one of the Heza hard drives.

[22]  Zarwasch testified that between December 7, 2009, when he turned in his SKF laptop, and November 10, 2010, the date of the spoliation hearing, he did not use any computer other than those at Heza and computers publicly available at hotels at which he

Similarly, the metadata for the versions of the Heza business plan e-mailed on March 15, 2010 and June 1, 2010 described the documents as created on January 13, 2010 and last saved by Helmut Zarwasch.  One of the versions of the business plan also described the document as saved on "Toshiba."

Balzanto was not able to determine if the missing stand-alone documents ever existed on the proffered Heza hard drives or had been erased from them.  He stated that documents could have existed on the Heza computers and, if they had been deleted, the recycle bin emptied, and aspects of the deleted files re-used by the operating system, they could not be recovered by the forensic software he used in his analysis.  He also testified that if the SKF laptop had been logged onto the SKF network, someone with any necessary access codes could access and use that computer.  He further testified that it is possible to alter metadata without leaving any indication of such alterations.  Finally, Balzanto testified that the type of analysis he performed did not enable him to determine if someone copied data by downloading it to a disc or transferring it to another hard drive.  The analysis could only determine when a USB drive was first and last connected to the computer.

Balzanto further testified that a computer appeared on Heza's computer network that had not been produced for imaging,  The registry hive indicated that this was a ToshibaZW computer belonging to Windows user "Helmut" and labeled "the Zarwasch desktop."  The "Helmut" account was created on June 18, 2010 and was in use between then and June 21, 2010.  Balzanto testified that the ToshibaZW may have been in use on the network after that date but that he was not able to ascertain this one way or the other.  Balzanto

_____

stayed.  He specifically denied using the Toshiba computer he bought on November 24, 2009 for any purpose other than to set it up for his brother.

was not presented a Toshiba computer or a forensic image of a Toshiba computer for his analysis.

Balzanto testified that on June 5, 2010, two e-mails sent by Zarwasch failed of delivery.  The failure message back to sender gave the messages as originating from a ToshibaZW computer.  The messages that failed of delivery were two of the messages identical to the e-mails with attached business plans sent on June 1, 2010.  On June 25, 2010, Zarwash sent an e-mail in German to Sabine Steinegger and Adreas Hochfellner, employees of DMH GmbH ("DMH").  DMH was a supplier of machinery necessary to Heza's production.  According to Balzanto, this e-mail and an attachment appeared on the Heza computers installed by Zarwasch in June 2010.  Also on June 25, 2010, the mail delivery system sent a message failure notice back to Zarwasch, reporting that one or more of the intended recipients could not be reached.  The message failure notice indicated that the intended e-mail had originated from [Helmut@Zarwasch.com](mailto:Helmut@Zarwasch.com) and came from a computer identified as ToshibaZW,

Bartholomew examined a forensic image of the Seagate drive.  He was unable to find any of the documents attached to e-mails sent by Zarwasch as stand-alone documents on the drive.

After expert examination of the electronic devices produced by defendants, SKF USA moved for a spoliation sanction against both defendants.  The court held a spoliation hearing on November 10, 2010.  Shortly after the hearing, the court issued preliminary findings of fact and conclusions of law, including the following factual findings.  Zarwasch copied extensive amounts of confidential information belonging to SKF to which he had access by virtue of his position at SKF Economos.  He took this information with him when

19

he left SKF Economos.  He used SKF's confidential information in conducting Heza's business.  When ordered by the court produce all relevant electronic devices and documents, he deliberately and intentionally failed to do so.  His testimony regarding his use, location, possession, and failure to produce these devices and documents was incredible and, in many respects, false.  The court concluded that Zarwasch spoliated evidence and that SKF USA was entitled to adverse inferences from this intentional failure to produce that evidence.  These inferences support the conclusions that Zarwasch extensively used SKF's confidential  information in conducting Heza Seal's business and that he remained in possession of extensive amounts of SKF's confidential information.

F.      *Trial on the merits and injunction hearing*

On December 17, 2010, the court began a five-day bench trial and injunction hearing in Case No. 1:10-cv-1548.  From the testimony and exhibits presented at the spoliation hearing and trial and from the parties' pleadings, the court reached the following findings of fact and conclusions of law.  Zarwasch improperly acquired SKF Economos's confidential information in a variety of ways.  Zarwasch secretly copied about 489,000 files on his SKF laptop to other electronic devices.  He took this information with him when he left SKF Economos.  The copied information included SKF Economos's customer list. Zarwasch's telephone also contained contact information for SKF Economos customers. When Zarwasch left SKF Economos, he did not notify SKF Economos that his telephone contained that information or delete that information from his telephone.  Zarwasch had access to this information by virtue of his position at SKF Economos.  He also reconstructed from memory portions of SKF Economos's customer list and vendor discount information.

20

Zarwasch also improperly disclosed SKF Economos's confidential information.  The business plans that Zarwasch used to seek loans for Heza included SKF Economos's financial information, including historical sales data.  Zarwasch also sent information about SKF Economos's costs of raw materials including price discounts for those materials, to Wolfgang Prandl, who represented DMH, a competitor of SKF Economos.  Zarwasch also sent SKF's customer database to Peter Holzer at Machine in Motion, another competitor of SKF Economos.

In addition, Zarwasch misappropriated SKF Economos's confidential information by using it.  He used SKF Economos's customer list when he sent e-mails announcing the formation of Heza to individuals on that list.  He used SKF Economos's confidential financial information when he incorporated it into his business plans and used those plans in an effort to attract lenders.  Zarwasch also used confidential information about the pricing and discounting of the raw materials obtained by SKF Economos to negotiate on behalf of Heza with potential sellers of raw materials.  Moreover, Zarwasch remained in possession of large amounts of SKF Economos's confidential information.

From these and other facts adduced at the December 17, 2010 hearing and trial, the court found that Zarwasch and Heza had misappropriated SKF Economos's trade secrets, that this misappropriation had damaged SKF Economos, and that their conduct had been willful and malicious.  *See* Memorandum of Opinion, February 3, 2011, Doc. No. 106.  On the basis of these and other findings, the court found for SKF USA on Counts I and II of the complaint, alleging violations of the OUTSA and breach of contract; found that Counts III, IV, and VI of the complaint were preempted by the OUTSA and dismissed them with prejudice; and dismissed Count V of the complaint, intentional interference with business

21

relationships, on the merits.  The court also denied SKF USA's motion for a temporary injunction as moot upon its grant of a permanent injunction against defendants.  The permanent injunction prohibited defendants from engaging in business relations of any kind with any entity on SKF Economos's customer list until August 4, 2012.  Finally, the court ordered defendants to purge from their possession and return to SKF all trade secrets and confidential information and to retain an independent auditor at their expense to verify their compliance with the purge and return.  The court specifically directed that a Toshiba laptop, which it found that Zarwasch had used to misappropriate, disclose, and use SKF Economos's information, must be included in the compliance audit.

G.    *Spoliation of the Toshiba laptop and failure to produce financial records*

On March 29, 2011, SKF USA moved for spoliation sanctions and to show cause why defendants should not be held in contempt based upon the following.  In response to the court's order to produce the Toshiba laptop, Zarwasch had produced a computer hard drive which he represented as having been installed in the Toshiba laptop.  The hard drive had eight holes drilled into it.  He also produced a Toshiba laptop computer with the hard drive and power source missing.  He claimed that he had given the laptop to his brother in Austria and, when he requested its return, his brother had sent it back in this condition.

The court held a hearing on plaintiff's motions for spoliation and contempt on Thursday, June 2, 2011 at 9:00 a.m.  It was impossible to determine whether the hard drive had been installed in the Toshiba laptop at any time in the past or to determine anything about how either the hard drive or laptop had been used prior to their production.  In particular, it was impossible to determine if any external memory devices had been attached to the Toshiba laptop prior to the destruction of the hard drive.  Although the court

22

did not award spoliation sanctions or find Zarwasch in contempt, it found that in many respects Zarwasch's testimony was not credible.

The court reached no conclusion as to who destroyed the hard drive.  The Toshiba laptop produced, however, appeared to be the same model and have the same identification number as the Toshiba laptop purchased by Zarwasch in the latter part of 2010.  The court concluded from evidence produced during the trial on the issue of liability and during the spoliation hearing that, at the very least, Zarwasch continued to use the Toshiba laptop until June 2010 and sent it to his brother to avoid discovery of information on its hard drive.  Consequently, although Zarwasch may not have been directly responsible for the destruction of the hard drive, his deliberate violation of his discovery obligations was a cause of the hard drive's destruction.  *See* Order, June 30, 2011, Case No. 1:10-cv-1548, Doc. No. 136, pp. 11-12.

On June 27, 2011, the court conducted a teleconference with the parties as a result of plaintiff's contention that defendants had failed to produce an accurate version of Heza's 2010 financial reports and had spoliated information necessary to plaintiff's case for damages.  Zarwasch represented that the version of the 2010 financial report he gave to plaintiff was the only version in his possession and that any deletions were the result of his attempts to purge SKF Economos's confidential information from his computer systems.  The court did not have enough information to determine whether Zarwasch had spoliated evidence, and it reserved that issue for the trial as to damages.

*H.      Trial as to damages and further spoliation*

On September 19 and 20, 2010, the court conducted a trial as to damages in Case No. 1:10-cv-1548.  Plaintiffs produced evidence during the trial that in January 2011

23

Zarwasch deliberately purged from Heza's accounting program, AccountEdge, information related to Heza's revenues, costs, profits, and deposits for 2010.  The only information remaining in AccountEdge was information related to open accounts.

Zarwasch's testified that he inadvertently deleted the missing information from AccountEdge in the course of closing out the 2010 fiscal year and that backups of the deleted information could not be located.  The court found this testimony not to be credible, for four reasons.  First, Zarwasch testified that he had been using the AccountEdge program for many years and was familiar with its operation.  Second,  evidence regarding how AccountEdge conducted a year-end close demonstrated that an inadvertent purge of information during a close was extraordinarily unlikely, even if the user were a novice.  Third, Zarwasch had not, at the time he purged the information, prepared Heza's tax returns for 2010.  Consequently, that he would have deleted the fiscal information without having a reliable backup file in a known and accessible location strained credulity.  Fourth, Zarwasch lacked credibility as he had persistently and deliberately failed to fulfill his discovery obligations and repeatedly lied to the court about his conduct during the course of this litigation.[23]  Consequently, the court concluded that Zarwasch deliberately deleted financial information from the AccountEdge program to prevent plaintiff from discovering Heza's fiscal condition and sales to SKF Economos's customers.

The expert in damages assessment hired by plaintiff, Patricia Domzalski

---

[23]  Zarwasch had earlier testified in a deposition that he was unable to retrieve Heza's invoices from 2010 in numerical order from the AccountEdge program.  This information was essential to determine which of Heza's revenues came from which customers, so that the revenue improperly diverted from SKF Economos's customers could be accurately assessed.  During the trial as to damages, Zarwasch testified that he had just discovered three days earlier that he was able to retrieve the necessary invoices after all.

24

("Domzalski"), testified that she had great difficulty determining the extent of the damages caused by Zarwasch's misappropriation of SKF Economos's trade secrets because much of Heza's 2010 financial information was missing from AccountEdge.  In particular, there was little information from which she could assess the 2010 revenue stream to Heza. Domzalski, by relying substantially on information other than that contained in AccountEdge, determined that Heza had obtained revenue from 42 entities that had been on the SKF Economos customer list that defendants misappropriated ("the 42 customers"). Domzalski was unable to determine fully the total revenues Heza received during 2010 and could not determine fully the revenues attributable to each of those 42 customers.

The information missing from Heza's financial records was considerable.  Domzalski was able to locate only 13 invoices for the 2010 fiscal year for which there were corresponding purchase orders indicating that an order had actually been placed.  In addition, due to the missing information, Domzalski was forced to use four boxes of disorganized financial documents and a collection of hard copies of invoices rather than quickly sorting the information from the AccountEdge program to reconstruct Heza's 2010 financial data.  Even after using the hard-copy financial documents, however, Domzalski was unable to locate at least 200 invoices from the relevant period.  The resulting assessment of damages based on Heza's revenue from the 42 customers was incomplete and understated, and took much longer to reconstruct because of Zarwasch's destruction of much of Heza's 2010[24] financial information.

In addition, Zarwasch failed to supply other information that might have assisted

---

[24]  At the beginning of the damages hearing, Zarwasch represented to the court that he filed his tax returns the previous Friday and provided the original to SKF Economos for copying.

25

Domzalski.  According to Domzalski, "Zarwasch claimed he has no records of cash receipts for HEZA for 2010; has not completed his taxes for 2010 and could not recall what information he had given to his accountant; [and] could not provide a chronological list of all invoices that HEZA has  issued since it started . . ."  Expert Report, Trial Exh. 320, p. 7 (citations omitted).  Zarwasch also failed to produce sufficient information regarding his Austrian bank account to allow Domzalski to determine if HEZA deposits had been made there, and he refused to allow her to talk to his accountant.[25]

Domzalski also testified that her assessment of damages resulting from Zarwasch's misappropriation of SKF Economos's trade secrets was conservative because she only included as damages revenue from the 42 customers that she could positively confirm.  Heza's partial financial information for 2010 did not, for the most part, permit determinations of which revenue came from which customers.  Thus, Domzalski's conclusions regarding revenue from the 42 customers during 2010 were necessarily an underestimation.

Domzalski further testified that she determined SKF Economos's damages by conservatively estimating Heza's total revenue from the 42 customers then multiplying the result by a contribution margin.  The contribution margin is an estimate of profits that subtracts only variable costs of production for filling the orders represented by the related

─────────────────

[25]    The extent of the irregularities in Heza's financial records was reflected in Domzalski's testimony that Heza's total revenue from only the 42 customers through March 1, 2011 was at least $340,210, while deposits in the only acknowledged Heza bank account, at First Merit Bank, totaled just $331,277 through March 31, 2011.  Moreover, Domzalski testified that the totals in three reports generated by AccountEdge, the Sales Register, the Sales Customer Detail, and the Sales Customer Summary, should agree.  In Heza's case, however, the totals were $1,304, 714; $1,286,314; and $75,326, respectively. According to Domzalski, the lack of agreement between these reports is not consistent with normal accounting and bookkeeping practices.

revenue.[26]  Domzalski determined Heza's revenue from the 42 customers through March 1, 2011 to be $340,210 and estimated Heza's contribution margin as 37%.  Consequently, she determined that Heza should disgorge $125,878 in profits to SKF Economos.[27]

Domzalski's testimony, methodology, assumptions, and data selection were in accordance with general damages assessment principles.  Her testimony was consistent, coherent, and unrebutted.  Consequently, the court found Domzalski's testimony to be credible and adopted her report in its entirety.

Upon the conclusion of the trial as to damages, the court made the following findings of fact:  (1) Zarwasch deliberately deleted financial information from the AccountEdge program to prevent plaintiff from discovering Heza's fiscal condition; (2) Zarwasch's deliberate deletion of information created considerable additional work for plaintiff's expert; (3) Zarwasch's deliberate deletion of information resulted in an estimate of damages that understates the amount of revenue Zarwasch diverted from SKF Economos by his misconduct; and (4) Zarwasch diverted a minimum of  $125,878 in profits from SKF Economos through his misconduct

As a result of the above findings, the court found Zarwasch liable to SKF Economos

---

[26]  "The contribution margin percentage represents the percentage of profit from sales taking into consideration only variable costs including direct labor and materials. Fixed costs are excluded since they continue to exist regardless of sales volume."  Expert Report at 7.

[27]  Plaintiff sought a non-rebuttable adverse inference that the damages determined by Domzalski reflect a minimum estimate of sales by former SKF Economos customers. A federal court has broad discretion to adopt such an adverse inference upon a finding that a party destroyed (1) evidence relevant to the other party's claims (2) while under an obligation to preserve it (3) with a culpable state of mind. *Beaven v. U.S. Dept. of Justice*, 622 F.3d 540, 553 (6th Cir. 2010).  While the court did not find it necessary to make such an inference, it found that Zarwasch's conduct permitted such an adverse inference

for violations of the OUTSA and for breach of contract.  Because damages pursuant to the OUTSA included all damages potentially recoverable for breach of contract, the court awarded all damages pursuant to the OUTSA alone.  The court awarded SKF USA $125,878 in compensatory damages.  Upon a finding that Zarwasch's misappropriation of SKF Economos's trade secrets was wilful and malicious and that Zarwasch's spoliation had made it impossible to determine the actual amount of damages, the court also awarded SKF USA pursuant to the OUTSA[28] $377,634 in punitive damages.  In addition, the court awarded certain attorney's fees pursuant to the OUTSA and pursuant to the court's inherent powers.  The attorney's fees awarded were the reasonable attorney's fees related to adjudication of plaintiff's motions for sanctions and contempt, doc. nos. 47, 116, & 117, and related to the reconstruction of Heza's financial information destroyed by Zarwasch. The court also levied as a sanction against Zarwasch pursuant to the OUTSA all costs and expenses, including expert fees, pertaining to the reconstruction Heza's financial information.  Finally, the court awarded SKF USA as a prevailing party pursuant to § 1920 all costs and expenses described in that section.

To determine the proper amount of attorney's fees, costs, and expenses awarded to SKF USA, the court gave SKF USA 30 days to file an application for attorneys fees, costs, and expenses, including appropriate affidavits.  SKF USA filed a motion for attorney's fees and costs, including a bill of costs, on November 2, 2011.  Zarwasch was given 30 days from the filing of SKF USA's application to file a response.  Zarwasch neither filed a response to SKF USA's application nor asked for an extension of time to file such a response.

---

[28]  *See* Ohio Rev. Code § 1333.63.

28

II.  Attorney's fees and Non-Taxable Costs and Expenses

SKF USA now moves for $167,055.26 in attorney's fees related to litigating its spoliation and contempt motions and also related to reconstructing Heza's financial information.

*A.    Applicable law*

Once a court determines that a party is entitled to fees and costs as a prevailing party, the primary concern is whether the fees and costs are reasonable.  *Blum v Stenson*, 465 U.S. 886, 893-95 (1984); *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004).  In determining a reasonable fee, the starting point is to determine the "lodestar," calculated by multiplying the number of hours reasonably expended by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983); *Isabel v. Memphis,* 404 F.3d 404, 415 (6th Cir. 2004).   The party seeking attorney's fees bears the burden of proving the reasonableness of the hours and the rates claimed.  *Hensley*, 461 U.S. at 433-34.  A prevailing party is not entitled to recover for "hours that are excessive, redundant, or otherwise unnecessary." *Id.* at 434.

The court determines the reasonableness of the claimed hourly rates by reference to the prevailing market rate in the relevant community, regardless of whether the plaintiff is represented by private or nonprofit counsel.  *See Johnson v. Clarksville*, 256 F. App'x 782, 783 (6th Cir. 2007), *citing Missouri v. Jenkins by Agyei*, 491 U.S. 274, 285 (1989).  A reasonable fee is "one that is adequate to attract competent counsel, but that does not produce windfalls to attorneys."  *Blum*, 465 U.S. at 897 (internal quotes and citation omitted); a*ccord Geier*, 372 F.3d at 791.  Reasonable hourly rates "do not exceed the market rates necessary to encourage competent lawyers to undertake the representation

29

in question." *Coulter v. Tennessee*, 805 F.2d 146, 149 (6th Cir. 1986).  The *Coulter* court stated:

> The statutes use the words "reasonable" fees, not "liberal" fees.  Such fees are different from the prices charged to well-to-do clients by the most noted lawyers and renowned firms in a region.  Under these statutes a renowned lawyer who customarily receives $250 an hour in a field in which competent and experienced lawyers in the region normally receive $85 an hour should be compensated at the lower rate.  We therefore apply the principle that hourly rates for fee awards should not exceed the market rates necessary to encourage competent lawyers to undertake the representation in question.

*Id.* (footnote omitted).    Courts may use state bar surveys and an attorney's "well-defined billing rates" as indicators in determining a reasonable hourly rate.  *Gonter v. Hunt Valve Co., Inc.*, 510 F.3d 610, 619 (6th Cir. 2007); *Hadix  v. Johnson*, 65 F.3d 532, 536 (6th Cir. 1995) (finding that "normal billing rates usually 'provide an efficient and fair short cut for determining the market rate.'" (citation omitted)).

Where counsel voluntarily undertakes representation in a foreign market, the relevant market and rate generally

> is that rate which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record, rather than foreign counsel's typical charge for work performed within a geographical area wherein he maintains his office and/or normally practices, at least where the lawyer's reasonable "home" rate exceeds the reasonable "local" charge.

*Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000), *citing Hudson v. Reno*, 130 F.3d 1193, 1208 (6th Cir.1997).  A reasonable fee is "one that is adequate to attract competent counsel, but that does not produce windfalls to attorneys."  *Blum*, 465 U.S. at 897 (internal quotes and citation omitted); a*ccord Geier*, 372 F.3d at 791.

The party seeking attorney's fees also bears the burden of proving the reasonableness of the hours billed and must exclude hours that are "excessive, redundant, or otherwise unnecessary."  *Hensley*, 461 U.S. at 434.  Attorneys seeking fees must

maintain time records that are sufficiently detailed to allow the court to determine the reasonableness of the hours expended with a high degree of certainty that the hours were actually expended.  *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 553 (6th Cir. 2008).[29]  There can be three different types of issues concerning excessive hours:  (1) factual questions about whether the work was actually performed; (2) legal questions about whether the work performed was sufficiently related to the issues on which the plaintiff prevailed; and (3) mixed questions involving billing judgment and whether counsel spent too much time on particular tasks or unnecessarily duplicated the work of co-counsel.

---

[29]  The Sixth Circuit has noted:

> Courts in this circuit have reduced attorney fees on the basis of insufficient billing descriptions where the attorney did not "maintain contemporaneous records of his time or the nature of his work," *Keener v. Dep't of the Army*, 136 F.R.D. 140, 147 (M.D.Tenn. 1991), *aff'd on decision of the district court by Keener v. Dep't of the Army*, No. 91-5442, 1992 WL 34580, 1992 U.S.App. LEXIS 2822 (6th Cir. Feb. 24, 1992), and where billing records "lumped" together time entries under one total so that it was "impossible to determine the amount of time spent on each task." *Cleveland Area Bd. of Realtors [v. Euclid]*, 965 F. Supp. [1017,] at 1021 [(N.D. Ohio 1997)].  On the other hand, this court has upheld an award of attorney fees and found billing records to be adequate where entries made by counsel "were sufficient even if the description for each entry was not explicitly detailed," *McCombs v. Meijer, Inc.*, 395 F.3d 346, 360 (6th Cir. 2005), and where the attorney provided the court with computerized calendars and file information indicating the dates and times of work performed. *Sigley v. Kuhn*, Nos. 98-3977/99-3531, 2000 WL 145187, 2000 U.S.App. LEXIS 1465 at *20-21 (6th Cir. Jan. 31, 2000); *see also Anderson v. Wilson*, 357 F.Supp.2d 991, 999 (E.D.Ky.2005) (holding that the Plaintiffs had satisfied their burden to provide sufficiently detailed billing records where counsel provided the court with "itemized statements describing the subject matter, the attorney, the time allotment, and the charge for all work done on Plaintiffs' case").

*Imwalle*, 515 F.3d at 553.

31

*Coulter*, 805 F.2d at 150-51.  A trial court's determination that hours are excessive or duplicative is a finding of fact subject to a clearly erroneous standard of review.  *Wayne v. Sebring*, 36 F.3d 517, 532 (6th Cir. 1994).  Furthermore, where the trial court determines that hours are excessive or duplicative, it may make "a simple across-the-board reduction by a certain percentage."  *Hudson*, 130 F.3d at 1209 (approving an across-the-board reduction of 25% for duplication of effort),[30] *citing Coulter*, 805 F.2d at 152 (approving a 50% across the board reduction for certain items due to multiple representation as the danger of duplication and wasted resources is difficult to measure); *see also Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, 707 F. Supp. 2d 737, 764-65 (N.D. Ohio 2010) (Lioi, J.) (finding that a 50% reduction in fees "is a fair and expeditious solution to determining the sum total of reasonable fees") (collecting cases).

Once a court has calculated the lodestar (*i.e.*, reasonable hours times a reasonable rate), the court may adjust the final fee award upwards or downwards and should consider the twelve factors identified in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974):

> (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

---

[30] *Hudson* was abrogated on other grounds by *Pollard v. E.I. du Pont Nemours & Co.*, 532 U.S. 843 (2001).

*Johnson*, 488 F.2d at 717-19.[31]  Each case is fact specific and there is no precise formula for determining fees.  *Hensley*, 461 U.S. at 436.  The most critical factor is the degree of success obtained.  *Id.*  However, there is a "strong presumption that the lodestar represents the reasonable fee."  *Burlington v. Dague*, 505 U.S. 557, 562 (1992).

B.    Hourly rates

SKF USA argues that the rates for each of its attorneys and paralegals in handling the motions for sanctions and contempt and in reconstructing Heza's financial information were reasonable because they were within the range of rates listed in the 2007 Ohio State Bar Survey[32] ("the 2007 survey") and because, in many cases, the rates were discounted and, thus, below the attorneys' usual rates.

1.    Pepper Hamilton, LLP

Pepper Hamilton, LLP ("Pepper Hamilton") details its attroney's fees in the chart attached to the motion as Exh. 1.  The highest hourly rate was charged by Stephen J. Sundheim ("Sundheim"), who billed SKF at a rate ranging from $433.50 to $446.25 per hour for a total of $63,684.84.  SKF USA argues that this rate was appropriate because (1) he is a senior partner at Pepper Hamilton, a large multi-office law firm in Philadelphia, Pennsylvania; (2) he has over 35 years' experience as a litigator and labor lawyer; and (3) he has represented SKF in other cases involving misappropriation of trade secrets by former employees.  The 2007 survey found that the billing rates for large law firms ranged from $200 to $446 per hour.  SKF USA concedes that Sundheim's rate is at the high end

---

[31]  In *Hensley*, 461 U.S. at 432, the Supreme Court recognized the 12 *Johnson* factors, but noted that these factors are usually subsumed within the calculation of reasonable hours at a reasonable rate.

[32]  *See* http://downloads.ohiobar.org/memrsrc/memben/pracrsrc/2007EoLS.pdf.

of the range, but it notes that this rate is justified by Sundheim's extensive experience.

The court agrees that Sundheim's lengthy experience justifies a rate at the higher end of the range for attorney's fees.  For this reason, the court finds these rates to be appropriate under the circumstances.

Pepper Hamilton billed SKF USA for the work of a junior associate, J.W. Jesioloski, at a rate of $195.50 per hour and for the work of mid-level associates, J.J. Williams, A.G. Bomstein, and L.M. Furst, within a range between $233.75 and $289.00 per hour.  SKF USA defended these rates as follows:

> According to the 2007 survey, the mean rate for an attorney in a large Ohio law firm was $273 per hour.  The rates that SKF paid for Pepper Hamilton associates Justin J. Williams, Alexander G. Bomstein, Lydia M. Furst and Joseph W. Jesiolowski are all under, or only slightly above, the average rate for attorneys at large Ohio law firms as determined four years ago.

Motion at 5.

As the mean rate for an attorney in a large Ohio law firm would include the rates of partners and senior partners, it is not entirely clear how representative this mean is as a measure of the reasonableness of the rates charged by associates.  The 2007 survey reports the mode[33] for associates with three years' experience as $166-175, with five years as $176-199, and ten years' experience as $200-224 (although the range of $250 was a close second to the mode in this distribution).  While Pepper Hamilton's billing rates for associates are somewhat high for Cleveland, the court cannot say that they are unreasonable.

---

[33]  The "mode" is a measure of central tendency, as is the average and the mean. The "mode" is that score or group of scores which appears most often in a distribution.  In this case, the mode reflects the rate charged by the greatest number of attorneys with similar experience.  The court finds this to be one appropriate method of determining which rates are reasonable.

Pepper Hamilton also billed SKF USA for "strategizing" with M.A. Schwartz at a rate of $446.25 per hour for a total of $995.14 for 2.23 hours' work.  M.A. Schwartz is not identified in defendants' motion, nor does the motion give any explanation for the rate charged for this work.  Consequently, plaintiff has failed to carry its burden of demonstrating the reasonableness of these fees.

Pepper Hamilton billed within a range of $148.75 to $157.25 for the work of legal assistants, charging a total of $9,386.64 for that work.  The 2007 survey found that only 3 of 171 legal assistants charged at a rate higher than $120.00 per hour, while the mode for legal assistants was $71-80.  Consequently, these rates are excessive for the work of legal assistants in Ohio.  The rate is, therefore, reduced by about one-third, and the total charged for the work of legal assistants is reduced by $3,186.64 to $6,200.00.

2.      *Reminger & Reminger, LLP*

Reminger & Reminger, LLP ("Reminger") details its attorney's fees in the chart attached to the motion as Exh. 2.  An attorney from Reminger & Reminger, LLP ("Reminger"), Martin T. Galvin, billed at a rate of $225.00 per hour.  The motion notes not only are these rates below the mean rate for large Ohio law firms, but also that Reminger discounted its rate for this case.

Reminger also billed $75 per hour for work by legal assistants.  The 2007 survey shows that is was within the mode for legal assistants.

Because these rates are well within the standard ranges for representation by large Ohio law firms, as described above, the court finds that they are reasonable and awards them as requested.

C.      *Hours billed*

35

The court awarded SKF USA attorney's fees related to two motions for sanctions, a motion for contempt, and the reconstruction of the Heza financial information destroyed by Zarwasch.  This involved reviewing Zarwasch's deposition, Balzanto's expert report, correspondence with defendants' attorneys, responses to requests for documents and interrogatories, Domzalski's expert report, and other documents.  It also required analysis, strategizing, discussions with co-counsel and opposing counsel, conferences with the court, research, drafting motions and proposed findings of fact and conclusions of law, preparation of a substantial part of the trial brief on the issue of damages, and preparation for and participation in two, day-long hearings and a trial on the issue of damages.  Plaintiff's attorneys billed 574.69 hours for the work of attorneys and legal assistants for these tasks.  They submitted detailed billing sheets, itemizing all items with descriptions adequate to explaining the nature of each charge.  Upon review of these billing sheets, the court finds the number of hours billed reasonable and the nature of the work within the scope of the court's award of attorney's fees.  For these reasons, the court makes no reduction in the total number of hours billed.

D.     *Non-taxable costs and expenses*

SKF USA also moves for $70,192.19 in non-taxable costs and expenses incurred by SKF USA and its experts in reconstructing Heza's financial information.

Awardable costs and expenses typically include both (1) costs arising from representation and typically charged to a fee-paying client, such as travel, copying and expert witness fees, and (2i) those that are incurred by a party and paid to a third party, not the attorney, such as filing fees and witness attendance fees.  *See Northcross v. Bd. of Ed. of Memphis City Schs.*, 611 F.2d 624, 639 (6th Cir. 1979); *Project Vote*, 2009 WL 917737,

36

at *19; *Disabled Patriots of Am., Inc. v. Odco Invs., Ltd.*, No. 04-cv-7399, 2009 WL 1767582, at *7 (N.D. Ohio June 23, 2009) (Katz, J.); *Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 297, 299 n.1 (2006).  The relevant filing fees are addressed in the next main section of this Memorandum.

E.      *Costs arising from the representation*

        1.      *Pepper Hamilton's fees and expenses*

        A chart at the end of Exh. 1 attached to the motion details Pepper Hamilton's fees and expenses, other than attorney's fees, related to the motions for sanctions, motion for contempt, and reconstruction of Heza's financial information.  The chart details $7,329.82 in charges, including Lexis research charges, telephone charges, costs of duplication, and travel expenses.  The research, telephone, and duplication expenses appear to be entirely reasonable.

        SKF USA has not justified, however, the listed travel costs.  It has not explained why retaining out-of-state counsel was reasonable because of either a paucity of attorneys in-state who might handle such work or the disinclination of those attorneys to handle SKF USA's litigation.   Absent such a justification, it cannot be said that SKF USA has demonstrated that the travel costs, largely for out of state travel, are reasonable.

        Exhibit 1 lists a total of $7,329.82 in fees and expenses.  Of these, the chart lists $6,053.32 in costs associated with travel.  The court disallows $5,500.00 as unjustified out-of-state travel.  Consequently, the court awards $1,829.82 of the fees and expenses listed in Exh. 1.


        2.      *Fees paid to 4Discovery*

4Discovery employed the forensics expert who examined Zarwasch's and Heza's computers and related devices, Balzanto.  The work charged by 4Discovery included identifying, extracting data from, and analyzing the data from the relevant computers and devices; preparation of an expert report; travel and related costs; correspondence and discussions with counsel; and preparation for hearings.  The rates charged ranged from $100.00 per hour to $200.00 per hour.

4Discovery  lists a total of 126 hours of work for a total of $24,771.37 in fees and related expenses.  Upon review of the nature of the work, the rates charged, and the hours billed, the court finds 4Discovery's fees to be reasonable as charged and awards $24,771.37 for those fees.

### 3.    Fees paid to Fesnak and Associates

Fesnak  and  Associates  ("Fesnak")  employed  the  expert  who  testified  at  the damages trial regarding the reconstruction of Heza's financial information, Domzalski.  At trial, she described the considerable efforts required to reconstruct the Heza financial information destroyed by Zarwasch, efforts prolonged by Zarwasch's refusal to cooperate with her.  *See supra.* at 25-26.  A chart attached to the motion as Exhibit 3 details the fees charged by Fesnak for organizing, studying, analyzing, and synthesizing the available data; preparing  a  report,  discussing  the  results  with  counsel;  preparing  for  trial;  and  travel. Fesnak details when the work was done, the nature of the work, the rate charged for the work, and any reductions made in the amount charged.  The rates charged ranged from $75.00 per hour to $350.00 per hour (charged by Domzalski).

Fesnak  lists a total of 226.5 hours of work for a total of $38,091.00 in fees.  Upon review of the nature of the work, the rates charged, and the hours billed, the court finds

Fesnak's fees to be reasonable and awards $38,091.00 for those fees.

F.     *Summary:  award of attorney's fees and costs*

SKF USA requests $167,055.26 in attorney's fees and costs.  The court has disallowed $994.14 for strategizing with M.A. Schwartz, $3,186.64 for the work of legal assistants, and $5,500.00 for out-of-state travel.  In total, the court has disallowed $9,680.78 in attorney's fees.  The court awards SKF USA, therefore, $157,374.48 in attorney's fees and costs.

III. Award Pursuant to § 1920

SKF USA also requests an award of $40,006.95 for those costs awarded pursuant to § 1920.  Section 1920 provides as follows:

A judge or clerk of any court of the United States may tax as costs the following:

**(1)** Fees of the clerk and marshal;

**(2)** Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

**(3)** Fees and disbursements for printing and witnesses;

**(4)** Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

**(5)** Docket fees under section 1923 of this title;

**(6)** Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

In its bill of costs, doc. no. 166, SKF USA details four costs within the scope of § 1920, listed below:

Charges for transcript recording and printing.................$26,403.45

39

Printing/copying costs...................................................$12,927.38

Costs for translation of documents......................................$656.12

Docket fees...........................................................................$20.00

The bill of costs is accompanied by the affidavit of Justin Williams, attorney for Pepper Hamilton, authenticating attached invoices for the above costs.

Given that this case involved two day-long spoliation hearings, a series of depositions, a combined injunction hearing and a trial as to liability, and a trial as to damages, the court finds the costs for transcripts and printing/copying to be reasonable. The costs of translation were incurred because certain key documents were in German. The costs incurred for translation, therefore, also were reasonable.  The cost for docket fees speaks for itself.

The court finds the costs incurred above to be reasonable and awards $40,006.95 for costs within the scope of § 1920.

## IV.  Conclusion

For the reasons described above, the court awards SKF USA and assesses against Zarwasch and Heza pursuant to the OUTSA attorney's fees and costs in the amount of $157,374.48.  The court also awards SKF USA and assesses against Zarwasch and Heza pursuant to § 1920 costs in the amount of $40,006.95.

**IT IS SO ORDERED.**


Date:  January 20, 2012                               *s/ Nancy A. Vecchiarelli*
                                                      U.S. Magistrate Judge

40